Edgar **MORALES,** et al., **Plaintiffs,**

v.

William M. **DALEY, Secretary of Commerce,** et al., **Defendants.**

No. H–00–1010.

United States District Court, S.D. Texas, Houston Division.

June 7, 2000.

J. Mark Brewer, Brewer and Pritchard, Houston, TX, for Plaintiffs.

Thomas W. Millet, U.S. Dept of Justice, Civil Div., Washington, DC, for Defendants.

### MEMORANDUM & ORDER

HARMON, District Judge.

### I. Introduction

Article I, Section 2, Clause 3 of the Constitution of the United States provides in pertinent part,

> Representatives ... shall be apportioned among the several States ... according to their respective Numbers.... The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct....

Congress, pursuant to the constitutional authority to direct the manner in which the "actual Enumeration" of the population shall be made, enacted the Census Act, 13 U.S.C. § 1 *et. seq.*, which delegated to the Secretary of Commerce authority to conduct the decennial census. *Id.* § 4. The Census Bureau, acting under the Secretary of Commerce, conducts the census.

Plaintiffs Edgar Morales, Laique Rehman, Nouhad K. Bassila, George Breckenridge, and William Jeffrey Van Fleet have brought a number of challenges to the constitutionality of Census 2000 and have asked for a permanent injunction of their obligation to answer the census questions asked of them.

After the court granted a limited temporary restraining order, which was agreed to by the defendants William M. Daley, Secretary of the Department of Commerce, and Kenneth Prewitt, Director of the United States Bureau of the Census United States [hereinafter, "United States," "the government," or "the Bureau"], preventing the United States from taking criminal action against the named plaintiffs if they failed to return their answered census forms, the court ordered the parties to cross-brief motions for summary judgment. It was agreed between the parties that there were no material facts at issue. Each side was then given an opportunity to respond to the other's brief.

Pending before the Court are those cross motions for summary judgment. The plaintiffs state the basic question of their lawsuit as "what kind of information may the United States Government demand of its citizens and compel them to provide under threat of criminal penalties should they not do so." They state the United States' position as one of being permitted to ask "virtually anything" that the Director of the Census chooses to ask. In other words, the plaintiffs maintain that there are "virtually no limits to the intrusiveness of census questions propounded by the government." As a corollary, they state that the government has unlimited power to fine or even imprison a citizen for failing to tell the government what it wants to know. Plaintiffs maintain that the only questions the government may lawfully compel answers to in connection with the census are questions that relate to the constitutionally-mandated enumeration or "head count" of the people who inhabit the United States and this only for purposes of apportionment. Any other questions, particularly the ones posed on both the "short form" and the "long form" census questionnaires, the answers to which are compelled under the threat of criminal penalties, are an unconstitutional invasion of the plaintiffs' privacy and are violative of the rights of the plaintiffs under the First, Fourth and Fourteenth Amendments to the United States Constitution.[1]

Plaintiffs state in their motion, and these facts have not been disputed, that the

---

1. Plaintiffs cite the Fourteenth Amendment, which the United States points out, is not applicable to the Federal Government. It is the Fifth Amendment's due process guarantee that Plaintiffs should look to. The due process rights set forth in the Fifth and Fourteenth Amendments have been found to be co-extensive. *Cf. Adarand Constructors v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

plaintiffs are all United States citizens. Plaintiffs Breckenridge and Van Fleet were born in the United States. Plaintiffs Bassila, Morales, and Rehman are naturalized citizens. Bassila was born in Lebanon. Rehman was born in Pakistan. Morales was born in Mexico. Although Morales was born in Mexico, he chooses not to categorize himself as "Hispanic," but classifies himself as American. The plaintiffs received questionnaires from the Census Bureau in the middle of March 2000. Bassila, Morales, Rehman, and Breckenridge received the "short form." Plaintiff Van Fleet received the "long form" questionnaire. The short form consists of eight questions that are asked of "person one." In order to comprehend fully the challenge plaintiffs bring, it is necessary to review in some detail the questions posed by both the short and long forms.[2]

### A. Short Form

The first question asks how many people were living or staying in the house, apartment, or mobile home on April 1, 2000. This is the only question mandated by Article I, Section 2, Clause 3.

Question two asks if the house, apartment, or mobile home is owned, with a mortgage, owned free and clear, rented for cash, or lived in without payment of rent. A question concerning "tenure," that is, whether the housing is owned or rented, has been asked in some form since 1890.[3]

Question three asks the name of a person who owns, is buying, or rents the home, apartment, or mobile home or any adult living or staying there. This person is then referred to as "person one."

Question four asks person one's telephone number.

Question five asks person one's sex. A question concerning the sex of individuals has been asked in the census since 1790.

Question six asks the age of person one and his date of birth. A question concerning the individual's age has been asked since 1790.

Question seven asks if person one is of Spanish, Hispanic, or Latino heritage. A question concerning Hispanic ethnicity has been asked on the census since 1970.

Question eight asks what is person one's race and directs person one to mark the block which he considers himself to be. These blocks are

1. white,

2. black, African American, or Negro,

3. American Indian or Alaska native, with space to provide the name of the enrolled or principal tribe,

4. Asian Indian,

5. Chinese,

6. Filipino,

7. other Asian, with a space to print the race,

8. Japanese,

9. Korean,

10. Vietnamese,

11. Native Hawaiian,

12. Guamanian or Chamorro,

13. Samoan,

14. Other Pacific Islander, and a space to print in the race.

---

**2.** Throughout this opinion the source for the factual make up of the census is taken front Exhibits 1, 2, and 3 to the Government's Motion to Dismiss, Or Alternatively, For Summary Judgment [Defendants' Brief]. These exhibits can be found at the Census Bureau website, "<www.census.gov>."

**3.** In the explanatory materials the Census Bureau has posted on its website, which were

provided to the court in the exhibits to Defendants' Brief, the Census Bureau has stated the year in which each category of question was first asked in a census and has also indicated the years in which categories of questions were dropped and picked up again in subsequent census efforts. The Census Bureau does not reproduce the actual questions asked in past years.

15. A block which reads "Some other race," and a space in which person one is to print the name of the race.

A question concerning race has been asked on the census form since 1790, although certainly not in the detail called for in the Year 2000 census form.

After the first eight questions have been asked, the questionnaire goes on to ask about each of the other persons living in the house, apartment, or mobile home. These persons are designated as person two, person three, and so on. For each of these persons in addition to person one, the questionnaire in the first question asks that person's name.

Question two asks how the person is related to person one. The choices are
1. husband/wife,
2. natural born son/daughter,
3. adopted son/daughter,
4. stepson/stepdaughter,
5. brother/sister,
6. father/mother,
7. grandchild,
8. parent-in-law,
9. son-in-law/daughter-in-law,
10. "other relative," with a space provided in which the person is to print the exact relationship.

Question two also allows answers for non-related persons, and the choices are
1. roomer, boarder,
2. housemate, roommate,
3. unmarried partner,
4. foster child,
5. other non-relatives.

A question concerning the relationships the persons who live in the home have to one another has been on the census form since 1880.

Question three for the additional persons asks each person's sex.

Question four asks each person's age and date of birth.

Questions five and six for the additional persons repeat the race questions set out above, that is, questions seven and eight, asked of person one.

## B. The Long Form

The long form has a format different from the short form. The first question asks how many people are living or staying in the house, apartment, or mobile home on April 1, 2000. The second question asks the names of all the persons who are living in the house. Then the census form addresses each person in turn. Person one answers a series of thirty-two questions beginning with his name (question one), telephone number (question two), sex (question three), age and date of birth (question four), whether the person is Spanish, Hispanic, or Latino (question five), and what is this person's race (question six).

Questions five and six on the long form are identical to questions seven and eight on the short form for person one, and questions five and six for the additional persons.

The long form then asks person one, in question seven, his marital status. A question on marital status has been asked in the census since 1880.

Question eight (a) asks, "At any time since February 1, 2000, has this person attended regular school or college?" Question eight (b) asks what grade or level was this person attending. A question concerning education enrollment has been asked on the census form since 1850.

Question nine asks what the highest degree or level of school was completed by the person answering. A question on education attainment has been asked on the census form since 1940.

Question ten asks, "What is this person's ancestry or ethnic origin?" It leaves a space in which the person can record his ethnic origin or ancestry, and suggests examples of Italian, Jamaican, African American, Cambodian, Cape Verdean, Norwegian, Dominican, French Canadian, Haitian, Korean, Lebanese, Polish, Niger-

806

ian, Mexican, Taiwanese, Ukranian, etc. A question on ancestry or ethnic origin has been asked on the census form since 1980.

Question eleven (a) asks if person one speaks a language other than English at home, and eleven (b) asks what that language is, giving examples of Korean, Italian, Spanish, and Vietnamese. Question eleven (c) asks how well the person speaks English and gives a choice between very well to not at all. A question concerning the language spoken at home was on the census form from 1890 through 1940, and has reappeared on the census forms from 1960 through the 1990 census.

Question twelve asks where the person was born and gives a space for the name of the state in which the person was born if the person was born in the United States, or a place for the name of the country if the person was born outside the United States. A question concerning place of birth has been asked on the census form since 1850.

Question thirteen asks if the person is a citizen of the United States and gives the choice of "yes," born in the United States, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas, born abroad of American parent or parents, a U.S. citizen by naturalization, or of "no," not a citizen of the United States. A question of citizenship was asked on the census form from 1820 through 1830, again in 1870, and then from 1890 through 1990.

Question fourteen asks when did the person answering the question come to live in the United States, and gives boxes for printing the year. A question on the year of entry was asked on the census from 1890 through 1930 and then again from 1970 through 1990.

Question fifteen (a) asks if the person answering lived "in this house or apartment five years ago (on April 1, 1995)." The choices for this question are "Person is under 5 years old," "Yes, this house," "No, outside the United States," with a space for writing in the name of the foreign country, and "No, different house in the United States." Question fifteen (b)

asks where the person lived five years ago and gives a space for the city, town, or post office. Question fifteen (b) further asks did this person live inside the limits of the city or town, and gives a block for yes or no. It further asks the name of the county in which the person lived, the name of the state, and the zip code. A question on "migration," that is, residence five years ago, has been on the census form since 1940.

Question sixteen asks, with blocks for "yes" or "no," "Does this person have any of the following long-lasting conditions, (a) Blindness, deafness, or a severe vision or hearing impairment? (b) A condition that substantially limits one or more basic physical activities such as walking, climbing stairs, reaching, lifting, or carrying?" Question seventeen asks, "Because of a physical, mental or emotional condition lasting 6 months or more, does this person have any difficulty in doing any of the following activities?" The choices given, with blocks for "yes" or "no," are "(a) Learning, remembering, or concentrating? (b) Dressing, bathing, or getting around inside the home? (c) (Answer if this person is 16 YEARS OLD OR OVER) going outside the home alone to shop or visit a doctor's office? [and] (d) (Answer if this person is 16 YEARS OLD OR OVER) working at a job or business?" Questions concerning disability were asked from 1830 through 1930, and again from 1970 through 1990.

Question eighteen asks if the person answering the questionnaire is under fifteen years of age on April 1, 2000. Again, a question on age has been asked on each census since the first one in 1790.

Question nineteen (a) asks if person one has any of his grandchildren under the age of eighteen living in the house or apartment. Question nineteen (b) asks if the grandparent is currently responsible for most of the basic needs of any grandchild under the age of eighteen who lives in the house or apartment. Question nineteen (c) asks how long the grandparent has been

responsible for the grandchildren, and gives choices of less than six months, six to eleven months, one or two years, three or four years, five years or more. This question is the only question that has never before been asked on the census in some form.

Question twenty (a) asks if the person has ever served on active duty in the United States armed forces, military reserves, or national guard. Question twenty (b) asks when the person served on active duty in the armed forces, and gives choices of dates and wars in which the person served. Question twenty (c) asks in total how many years of active duty military service has this person had and gives choices for various periods of time. Questions on veteran status were asked in 1840, 1890, 1910, and from 1930 through 1990.

Question twenty-one asks, "Last week, did this person do any work for either pay or profit?" and gives a choice of "yes" or "no." A question on labor force status has been asked on the census form since 1930.

Question twenty-two asks at what location did this person work last week, with a space in subpart (a) for writing in the address (number and street name). The question also suggests that if the exact address is not known, a description of the location, such as the building name or the nearest street or intersection may be provided as an answer to this subpart. Subpart (b) of Question twenty-two asks the name of the city, town, or post office. Subpart (c) of Question twenty-two asks if the work location is inside the limits of that city or town. Subpart (d) of Question twenty-two asks the name of the county. Subpart (e) of Question twenty-two asks the name of the state or foreign country. Subpart (f) of the same question asks for the zip code. A question on the place of work has been asked since 1960 on the census form.

Question twenty-three (a) asks how person one usually got to work last week and gives a number of choices: car, truck, or van; bus or trolley bus; streetcar or trolley car; subway or elevated; railroad; fer-ry boat; taxi cab; motorcycle; bicycle; walked; worked at home; other method. The question then indicates that if "car, truck or van" is marked in twenty-three (a), the person responding to twenty-three (a) is to answer question twenty-three (b). If not, the person responding is to skip to twenty-four (a). Question twenty-three (b) asks how many people including person one usually rode to work in the car, truck, or van last week. Question twenty-three (b) gives the choices of drove alone, two people, three people, four people, five or six people, and seven or more people. Question twenty-four (a) asks at what time of day person one usually left home to go to work last week. Question twenty-four (b) asks how many miles that it usually takes person one to get from home to work last week with a space for writing in the minutes. A question about the journey to work has been asked on the census since 1960.

Questions twenty-five and twenty-six are for persons who did not work for pay or profit last week. Question twenty-five (a) asks if last week the responding person was on layoff from a job. Question twenty-five (b) asks if the person temporarily was absent from a job or business. Question twenty-five (c) asks if the person had been informed that he will be recalled to work within the next six months or been given a date to return to work. Question twenty-five (d) asks if person one has been looking for work during the last four weeks, and Question twenty-five (e) asks last week could the person have started a job if one was offered or returned to work if recalled. Question twenty-six asks when did person one last work even for a few days and gives two choices, either "1995 to 2000" or "1994 or earlier or never worked." Questions on labor force status have been on the census form since 1930.

Question twenty-seven concerns the industry or employer and asks person one to "describe this person's chief job or business last week. If this person had more than one job, describe the one at which

this person worked the most hours. If this person had no job or business last week, give the information for his/her last job or business since 1995." Question twenty-seven (a) asks for whom the person worked. Question twenty-seven (b) asks about the kind of business or industry worked for, and suggests the activities (for example, hospital, newspaper publishing, mail order house, auto repair shop, bank). Question twenty-seven (c) asks if the job is mainly manufacturing, wholesale trade, retail trade, or other, with suggestions of agriculture, construction, service, and government. Questions about the industry for which a person worked has been asked on the census form beginning in 1820. Such questions were asked again in 1840, and have been asked in each census from 1910 through 1990.

Question twenty-eight asks about occupation. Question twenty-eight (a) asks "what kind of work was this person doing?" It gives the examples of registered nurse, personnel manager, supervisor of order department, auto mechanic, accountant. Question twenty-eight (b) asks what were this person's most important activities or duties, and suggests patient care, directing hiring policies, supervising order clerks, repairing automobiles, reconciling financial records. Questions on occupation have been asked on the census form since 1850.

Question twenty-nine asks what kind of enterprise the person was working in, and gives choices of employee of a private for profit company or business or of an individual for wages, salary or commissions; employee of a private not-for-profit tax exempt or charitable organization; local government employee; state government employee; federal government employee; self-employed in own not incorporated business, professional practice, or farm; self-employed in own incorporated business, professional practice, or farm; working without pay in family business or farm. Questions on the class of worker, that is, type of employment, whether private, governmental, self employed, or working as an unpaid family worker, have appeared on the census form since 1910.

Question thirty (a) asks "Last year, 1999, did this person work at a job or business at any time?" Blocks for "yes" or "no" are provided. Question thirty (b) asks how many weeks did this person work in 1999. Question thirty (c) asks, "During the weeks worked in 1999 how many hours did this person usually work each week?" Questions on work status last year have been on the census form since 1940.

Question thirty-one asks about income in 1999. Question thirty-one (a) asks about wages, salaries, commissions, bonuses, or tips from all jobs. Question thirty-one (b) asks about amount earned from self employment income from owned non-farm business or farm businesses, including proprietorships and partnerships. Question thirty-one (c) asks about interest, dividends, net original income, royalty income, or income from estates and trusts. Question thirty-one (d) asks about social security or railroad retirement. Question thirty-one (e) asks about supplemental security income. Question thirty-one (f) asks about any public assistance or welfare payments from the state or local welfare office. Question thirty-one (g) asks about retirement, survivor, or disability pensions. Question thirty-one (h) asks about any other sources of income received regularly such as veterans payments, unemployment compensation, child support, or alimony. Each of these subparts of question thirty-one asks person one to write out the annual amount in dollars. Question thirty-two asks what was this person's total income in 1999. Questions on amount of income have been on the census form since 1940.

Questions thirty-three through fifty-three ask person one a series of detailed questions concerning the house, apartment, or mobile home in which person one is living. In 1890 the persons were first asked if the home was rented or owned. Questions concerning the value of the home and the rent paid have been asked on the census form since 1930. Questions

concerning the year the home structure was built, number of units in the structure, number of rooms in the structure, plumbing facilities, and house heating fuel have been asked on the census form since 1940. Since 1960, the census form has contained questions concerning number of bedrooms, kitchen facilities, and the year the person moved into the unit. Whether the home is a farm residence has been asked since 1970. Questions concerning whether telephone service is available and selected monthly owner costs were added in 1980.

Persons two through infinity are not asked on the long form about housing, but they are asked in question one their name, and in question two how the person is related to person one. Persons two through infinity are then asked questions three through thirty-two that are asked of person one.

Plaintiffs are complaining, in particular, about the questions on the short form that ask a resident of the United States if he is Hispanic and what kind of Hispanic he is. Plaintiffs also object to the question which asks the resident what race he would self categorize himself to be. They also object to the question asking how a person is related to the other persons who live in the house with him.

On the long form they object to these question and a number of others. Specifically, they object to the question concerning marital status (7), educational background (8–10), ancestry and ethnic origin (10), whether the person speaks a language other than English, and, if so, which one, and how well the person speaks English (11), length of residence in the dwelling (15), medical conditions or problems (16 and 17), where the person worked "last week" (22), how the person got to work (23), when the person left home for work and how long it took to get there (24), work/layoff/absence history (25 and 26), occupation and employer (27–30), income and source of income (31 and 32), the nature of the housing, including the number of rooms and bedrooms in the house (37 and 38), plumbing, kitchen, and phone

service (39 to 41), information about rent, mortgage, insurance, and home value (46–53). Plaintiffs also object to the fact that stated prominently on the envelope in which the census forms are mailed are the words, "You are required by law to answer these questions."

Title 13 U.S.C. § 221(a) and (b) provides that if a person fails to respond to an answer he can be fined up to $100 for each unanswered question. If an answer is incorrect, the person is subject to a fine of up to $500 for each incorrect answer. Plaintiffs contend that the questions on the long and short forms, beyond the questions dealing with the number of residents in the dwelling, are intrusive, objectionable, and invade their privacy. They do not want to answer them. They feel intimidated by the threat of criminal sanctions if they fail to answer the questions, and they feel that if they protect their privacy and refuse to answer that they will be exposing themselves to hundreds or, if they were unlucky and received the long form, thousands of dollars in fines.

## II. *Constitutional Limitation on the Census*

The review of the Census 2000 reveals that from the first census, taken in 1790, the Congress has never performed a mere headcount. It has always included additional data points, such as race, sex, and age of the persons counted.

■ In *M'Culloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819), the Supreme Court held that Congress had the authority to establish a national bank in the absence of a constitutional provision specifically setting one forth because the Constitution "empower[ed] congress to pass all necessary and proper laws for carrying its powers into execution." *Id.* at 324, 17 U.S. 316. The government argues that the Necessary and Proper Clause of the Constitution, together with the clear language of Article I, Section 2, Clause 3, which gives to Congress the power to conduct the decennial

census "in such Manner as they shall by Law direct," gives to Congress the authority to collect demographic information about the nation's population in order to enable Congress to exercise its delegated powers to govern that population intelligently. In *Legal Tender Cases*, 12 Wall. 457, 79 U.S. 457, 20 L.Ed. 287 (1870), the Supreme Court stated

> The Constitution orders an enumeration of free persons in the different states every ten years. The direction extends no further Yet Congress has repeatedly directed an enumeration not only of free persons in the States but of free persons in the Territories, and not only an enumeration of persons but the collection of statistics respecting age, sex, and production. Who questions the power to do this?

*Id.* at 536. In *United States v. Moriarity*, 106 F. 886 (S.D.N.Y.1901), the court addressed precisely and rejected the argument plaintiffs present that the power of Congress conferred by Article I, Section 2, Clause 3 is limited to a headcount of the population. The *Moriarty* court held,

> This does not prohibit the gathering of other statistics, if "necessary and proper," for the intelligent exercise of other powers enumerated in the constitution, and in such case there could be no objection to acquiring this information through the same machinery by which the population is enumerated, especially as such course would favor economy as well as the convenience of the government and the citizens.... For the national government to know something, if not everything, beyond the fact that the population of each state reaches a certain limit, is apparent, when it is considered what is the dependence of this pop-

ulation upon the intelligent action of the general government. *Id.* at 891.

### III. Suspect Classification

Nevertheless, plaintiffs argue that their rights under the Fifth and Fourteenth Amendments have been violated because the defendants cannot demonstrate a legitimate justification for census questions beyond those pertaining to the sole constitutional purpose of the census, the actual enumeration mandated by the Constitution in Article 1, Section 2, Clause 3.

Plaintiffs argue that the imposition of race, ethnicity, legitimacy, sexual preference, and alienage questions, and an additional question for Hispanic persons, violates the equal protection guarantees of the United States Constitution, Amendments Five and Fourteen, and the enabling legislation thereunder, 42 U.S.C. § 1983 *et seq.* and 42 U.S.C. § 1986 *et seq.*[4] Plaintiffs maintain that "at the heart of this claim" is the threat to prosecute the plaintiffs as criminals if they assert their constitutional rights and refuse to answer the defendants' questions.

#### A. Race, National Origin, and Alienage

Classifications of race, ethnicity, and alienage are clearly set out in both the short form at questions seven and eight for person one and questions five and six for persons two to infinity, and in the long form at questions five, six, ten, twelve, thirteen and fourteen. Plaintiffs argue that any classification based on race or national origin demands a strict scrutiny evaluation and requires a classification to be narrowly tailored to a compelling, overriding, governmental interest.

The ethnicity category of question ten is particularly suspect, plaintiffs maintain,

---

**4.** Plaintiffs point out that the person who responds that he is Hispanic is then asked an additional question of what kind of Hispanic he considers himself to be. They argue that this additional question constitutes disparate treatment of persons who self-classify themselves as Hispanic. Although Hispanics are the only ethnic group asked an additional question of this type, the court fails to see how this additional question, asked in the context of data gathering, rises to the level of illegal discrimination.

because not only is there a lack of governmental interest, but there is also a strong public policy reason to ensure that such information is not collected. If such information is not collected, it can never be misused under the justification of a national emergency as it was used during the Second World War. Plaintiffs cite, with no challenge by the government, that census data of this type was used during the Second World War to identify Americans with Japanese ancestry. These persons were then placed in internment camps for the duration of the war. This is a startling example of how census data, collected for proper purposes, has been illegally used by the government for improper purposes. Plaintiffs argue that if such data is collected, it could only be used for discriminatory purposes.[5] Plaintiffs have not alleged or shown, however, that the data is likely to be used to discriminate against them specifically.

The alienage questions, twelve through fourteen, deal with place of birth, citizenship, and year of entry. For this question the Bureau indicates that it needs the information so that the Justice Department Immigration and Naturalization Service can "project staffing and other resource needs for non-citizens to complete the naturalization process." Plaintiffs argue that this justification is a tacit recognition of the absurd lack of basis for this suspect classification. They further argue that the Bureau is disingenuous in making the statement that "the question on citizenship does not attempt to determine the legal status of immigrants" because if the legal status of the person is not being determined, there is no reason for asking the question. The question becomes even more disingenuous, plaintiffs argue, because the Census Bureau advertises that the responses to this questionnaire will not be given to the Immigration and Naturalization Service.

Plaintiffs argue that when a government uses a classification based on race or national origin a strict scrutiny standard is used, requiring a classification to be necessary, that is, narrowly tailored, to a compelling or overriding governmental interest. Plaintiffs cite *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), and *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). They argue that there can be no question that, on a literal basis, asking a resident of the United States to indicate on a form his race or national origin is a classification by the government, since it is the government asking the question on a government form under the threat of prosecution should the resident fail to answer the question. Plaintiffs argue that only if Congress clearly articulates the need and basis for a racial or ethnicity classification and tailors the classification to that justification, can such a statute be upheld. They maintain that Congress has articulated no need nor basis for the census's racial and ethnic classification, nor has Congress tailored the classification to its need, and plaintiffs point out further that there is no justifica-

5. No prior case authority questions the confidentiality of the census information, but in the era of the World Wide Web, with computer "glitches" and human error that can instantaneously disseminate private information literally all over the world, the citizen can have a justifiable wariness about the secrecy of the information he gives. Recent non-world wide web incidents made this fact tangible, one involving hundreds of FBI files that were sent to low-level White House functionaries who had no need-to-know, and others involving confidential government personnel file information on controversial government employees, or would-be employees, sent to the me- dia. The plaintiffs thus cannot be faulted for questioning whether the census data, so carefully and anonymously compiled, will not be misused by the government. The horrors of the twentieth century do not allow one comfortably to accept the notion that the Japanese–American experience during the Second World War was an isolated incident in the history of the United States. We all can envision other ethnic groups who could be treated in a similar fashion, given the "proper" emergency. Nevertheless, a solution to this problem is one properly addressed by Congress, not by a court dealing with a purely hypothetical situation.

tion to which such classification may be tailored.

### B. Legitimacy, Sexual Preference, Income

Plaintiffs argue further that the legitimacy category is a suspect classification. Legitimacy and illegitimacy can be determined from three sets of data: (1) the marital status of persons one and two, which includes a data choice of "unmarried partner," (2) the length of time these persons have lived together (question fifteen), and (3) the relationship of person three (son or daughter) to person one (question two), which includes data choice "natural born son/daughter." The Bureau's justification contained in the background documents for this questions is that "categories showing natural born, step, and adoptive children are necessary to reflect the increasingly complex family structures created as a result of marital disruption, remarriage, and cohabitation." The plaintiffs argue that for this suspect classification question the Bureau makes no attempt to identify compelling governmental interests. The plaintiffs argue that asking these questions is simply an indication of the Census Bureau's "snooping" on the American public.

Similarly, sexual preference can be determined from (1) the relationship of person one to person two (question two, which gives a data choice, "unmarried partner"), and (2) the question of the person's sex (question five for person one and question three for subsequent persons). Sex is another constitutionally suspect category. *Frontiero v. Richardson*, 411 U.S. 677, 682, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). The Supreme Court in *Frontiero* held that classifications based upon sex are inherently suspect and must be subjected to strict judicial scrutiny. *Id.*

The plaintiffs also point out various other classifications subject to either the "substantial relationship" to an important government interest or a rational relationship to a legitimate interest of government. *Harris v. McRae*, 448 U.S. 297, 324, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

Plaintiffs argue in essence that all census questions from two to the end of both forms cannot be valid because the Bureau cannot demonstrate a substantial or rational relationship between the answers to the questions and a legitimate interest of the government. The plaintiffs argue that the burden is on the government to demonstrate more than a mere legitimate interest.

### C. Threat of Prosecution

Plaintiff Van Fleet, the only one of the plaintiffs to receive the long form, argues that he faces a clear and unambiguous risk of prosecution for failure to answer the long form that far and away exceeds the risk faced by the short form recipients. The short form has eight questions for the first response. The long form has 53 questions. Additionally, each member of the long form recipient's household has an additional 33 questions. Van Fleet, the head of a family of four, is subjected to 152 questions, each with its own, separate penalty for non-response. Thus, Van Fleet, if he chose not to answer the long form, faces a fine of as much as $15,200. His fine, had he received the short form, would not exceed $300. Van Fleet argues that this subjects him to an egregiously unequal risk of prosecution in violation of his equal protection and due process rights, a risk of prosecution due to his standing, economic, racial, or otherwise. He cites *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). In that case, the Supreme Court dealt with "[p]roviding equal justice for poor and rich, weak and powerful alike...." *Id.* at 16, 76 S.Ct. 585. The government counters by pointing out that, unlike in the case of *Griffin v. Illinois*, Van Fleet does not allege that he was singled out because of his lack of wealth. If he has legitimately received a long form, then he is subject to the same penalty as anyone for not returning his form or for falsely answering any question. The long forms are randomly distributed, and although it seems rather excessive that for failing to answer a long form one could

potentially be fined in the thousands of dollars, Van Fleet has not been singled out impermissibly. The problem would seem to be one of Congress's enactment of the statute, rather than the use of the long form itself.

■ Plaintiffs raise the question on the validity of asking questions about legitimacy, sexual preference, and income, but their argument focuses almost exclusively upon race and ethnicity questions. In the government's response, it refers to its Exhibit 1 to its Motion for Summary Judgment, which sets out numerous non-discriminatory reasons why all of these questions have been asked. The Bureau has listed three federal uses and three additional community impact items to support the race classification question. These five justifications are listed under a heading entitled "What it means for everyone." This heading deals with each category of inquiry on the long form. For the race classification question, which has appeared on all census forms, the Bureau states that the answers are "needed to assess racial disparities in health and environmental risks." For "community impact" the Bureau states that the answers to the race classification question are "required by states to meet legislative redistricting requirements by knowing the racial makeup of the voting age population." This community impact has been the use of the census for the years following the Voting Rights Act, 42 U.S.C.A. § 1973. Plaintiffs argue that by acknowledging the use of the census on racial population for determining redistricting by state legislatures, the Census Bureau has admitted that its use will be for a clearly unconstitutional purpose. Plaintiffs conclude, "[T]he very fact of asking race-based questions, not only violates plaintiffs' right to the Equal protection; it creates a virtually certain equal protection violation during the redistricting process." Plaintiffs go further to argue that only by eliminating the race question on the census can governmental bodies be deprived of the resource to continue a race-ridden society. They argue that the lesson of

*Adarand* and *Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), is that Americans can never achieve a "color-blind kind of race neutral society," until the government sheds all the vestiges of racial classification.

The government's response is to point out that plaintiffs make no claim that Census 2000 discriminates against any protected group. Rather, the argument is that the prohibition against disparate treatment precludes the compilation of demographic data regarding protected groups. The government's position is that case law is clear that it is differential treatment, not classification, that implicates equal protection, and cites the opinion *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992): "The equal protection clause does not forbid classification. It simply keeps decision makers from treating differently persons who are in all relevant respects alike."

The government also cites *Caulfield v. Board of Educ. of the City of N.Y.*, 583 F.2d 605 (2nd Cir.1978), which held "the Constitution itself does not condemn the collection of this data," referring to a local census of the racial and ethnic breakdown of public school employees. *Id.* at 611. *Adarand* held that equal protection guards against government actions based on race, but does not deal with government collection of data on race. The government goes on to argue that the collection of data such as that asked for on the Census 2000 forms is vital to guard against discrimination based on race or ethnicity. *See Shaw v. Reno*, 509 U.S. 630, 634, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); *Miller v. Johnson*, 515 U.S. 900, 906, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *Hunt v. Cromartie*, 526 U.S. 541, 544, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). These cases rely upon census data to review equal protection challenges to redistricting plans.

The First Circuit in *United States v. New Hampshire*, 539 F.2d 277, 280 (1st Cir.1976), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 641, 50 L.Ed.2d 625 (1976), ad-

dressed a challenge by the state of New Hampshire to a requirement that it provide to the federal government, on an EEO–4 form, certain statistical data concerning the racial makeup of employees of the state. The form also required the state and local governmental units to furnish the wage, national origin, and sex of employees in various job categories pursuant to § 709c of the Civil Rights Act of 1964. The First Circuit determined that this type of information "is often highly useful when an agency or court attempts to make the often difficult inference that illegal discrimination is or is not present in a particular factual context," and that Congress had constitutional authority to enact statutes to ensure such compliance. *Id.*

*Wisconsin v. New York,* 517 U.S. 1, 116 S.Ct. 1091, 134 L.Ed.2d 167 (1996), makes it clear that the Constitution has given to Congress very broad discretion in conducting the census. The case also, in its recitation of the history of the census in the United States, which is reiterated in the Supreme Court's decision in *Department of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999), notes that the census as mandated by the Constitution is for enumeration so that congressional districts may be established, but that the census-taking process has a long history of including much more than a simple headcount. The government's position is that because the plaintiffs' Fifth Amendment due process challenge to the racial class and ethnic classification questions cannot be tied to disparate treatment of those answering the questions, a compelling governmental interest need not be shown. Rather, the historical use of such information recognized by the courts, coupled with the historical use of the census to obtain answers to those questions, mandate affirming the use the Census 2000 forms. The government emphasizes that these questions have historically been answered, and that the Supreme Court and lesser courts have accepted, without question, the propriety of collecting the data on race and ethnicity.

The plaintiffs recognize that the questions have been asked in the past, but argue that the government's justification of the ethnicity question on the long form, question ten, rings hollow in light of the Japanese experience during World War II. The Bureau justifies this question by stating that it is "required to enforce provisions under the Civil Rights Act which prohibits discrimination based upon race, sex, religion and national origin." The First Circuit in *New Hampshire* addressed a similar argument by pointing out that

[P]ossible and purely hypothetical misuse of data does not require the banning of reasonable procedures to acquire such data. Statistical information as such is a rather neutral entity which only becomes meaningful when it is interpreted. And any positive steps which the United States might subsequently take as a result of its interpretation of the data in question remains subject to law and judicial scrutiny.

539 F.2d at 280.

Plaintiffs' position is based upon a misunderstanding of the distinction between collecting demographic data so that the government may have the information it believes at a given time it needs in order to govern, and governmental use of suspect classifications without a compelling interest. Plaintiffs may disagree with the government's need to know such information, but Congress has delegated to the Bureau the authority to decide what is needed and to ask the appropriate questions. The plaintiffs' position, particularly on the race and ethnicity questions, is one that attempts to strike at the root of the problem of racial and ethnic classifications. Their argument is that racial and ethnic self-classification that is mandated by the government itself can do nothing to propel this country toward a society in which race and ethnicity do not matter. Many would agree with their argument, but the issue here is not social, moral, or political. The issue is whether requiring a person to self-classify racially or ethnically, knowing to what use such classifications have been put

in the past, can violate the due process implications of the Fifth Amendment. This court holds that such self-classifications do not. The issue raised by the plaintiffs is one properly addressed by Congress, not by the courts. The Bureau has stated for each of the challenged questions the statutory mandate, other reasons, or both why this demographic information is needed. The Constitution requires nothing more.

## IV. First Amendment

The plaintiffs argue that by requiring them to classify and categorize themselves by race, the Bureau violates their rights under the First Amendment by forcing them to engage in speech which is abhorrent and contrary to their beliefs. Short form question seven directed to person one and short form question five directed to the other occupants ask if the respondent is "Spanish/Hispanic/Latino," and if so, ask the respondent to identify himself as (1) Mexican, Mexican American, Chicano; (2) Puerto Rican; (3) Cuban; or (4) "other" Hispanic/Latino.

Short form question eight asks person one and short form question six asks the other occupants to classify themselves by race, asking the responding persons to check "one or more races to indicate what this person considers himself/herself to be." There follows an extensive list of races with a final category "some other race" with a space to print that race.

The long form asks the same questions in identical language. Question five asks about Hispanic status, and question six asks about race. Question ten on the long form also asks "what is this person's ancestry or ethnic origin?" Again, there are examples given.

Plaintiffs' argument is that they do not wish to categorize themselves by race and do not think of themselves in those terms. Nor do they think of themselves in terms of ethnicity or ethnic origin, and they find such classification and categorization by race "deeply offensive and abhorrent, personally, ethically and politically." They

prefer to describe themselves merely as "Americans." The government, however, on the long and short form, requires the plaintiffs to classify, categorize, and describe themselves in terms of race and ethnicity. Failure to do so subjects them to criminal sanction and a fine of up to $100 for each question they fail to answer or up to $500 for each question they answer incorrectly.

Plaintiffs argue that the First Amendment protects their freedom of thought and expression, both the right to speak freely and their right to refrain from speaking at all. They cite *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), in which the compelled display of the state motto "Live Free or Die" on automobile license plates was found to unconstitutionally compel speech.

Plaintiffs argue that defendants' efforts to coerce them under threat of criminal prosecution into categorizing themselves by race, ancestry, or ethnic origin, is an effort to coerce political speech. They point out that there are few more politically charged issues in the United States today than those touching on race and ethnicity, and that entire government programs and policies are structured around questions of race and ethnicity. The plaintiffs argue that the defendants' own statements in published census material stress the importance of racial and ethnic information and the use of such information in political decisionmaking. The plaintiffs believe that there are "far too many divisions in this country based on race and ethnicity, and in their view, these divisions are exacerbated by the government's persistence in categorizing people according to race. In short, plaintiffs do not wish to [play] the 'race game' by cooperating with and acquiescing with in what they see as the 'Balkanization' of America." They cite the Supreme Court's statement in *Wooley* : "[T]he First Amendment protects the right of individuals to hold a point of view different from a majority and to refuse to foster ... an idea that they find morally objectionable." *Id.* at 815, 97 S.Ct. 1428.

The government dismisses the plaintiffs' First Amendment argument by restating it as "their claim is that their rights 'not to speak' allows them to withhold information which the federal government has determined to be necessary for informed government decision making. This argument misreads applicable law." The government argues that plaintiffs are not being required to espouse a point of view contrary to their own, but are required to provide information. Under 13 U.S.C. § 9, the census information provided cannot be published in any format in which individual respondent information can be identified, and only sworn officers or employees can examine individual returns; by answering the questions, the plaintiffs are not being required to espouse publicly a repugnant idea or to engage in compelled speech.[6]

In *United States v. Sindel,* 53 F.3d 874 (8th Cir.1995), the court rejected a claim that compelled disclosure of information on an Internal Revenue Service form was unlawful compelled speech. The Eighth Circuit held, "There is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society—as in the case of compulsion to give evidence in court.'" *Id.* at 878 (quoting *West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 645, 63 S.Ct. 1178, 87 L.Ed. 1628 (Murphy, J., concurring)).

It is the knowledge of the use of this statistical data to which the plaintiffs are compelled to contribute, that gives rise to their disinclination to give the information on political and moral grounds. Plaintiffs have argued repeatedly that the demands for the information are not legitimate and they will be used for a purpose they believe is politically and morally illegitimate. Moreover, plaintiffs are not confident that their answers would not be used purely for statistical purposes or that they would be maintained in confidentiality. This inchoate concern is not enough to make this case one of compelled speech, such as *Wooley; West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (compelling a child to salute the flag); or *Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (requiring a newspaper to publish the replies of political candidates whom it had criticized).

The government seeks from all residents of the United States certain demographic information from which it compiles statistics. It is these compiled statistics that are used for governmental purposes. Congress has decided that it needs this data. It has expressed, through the Census Bureau, its justification for the need. Plaintiffs may believe the justification is trivial; they may object to its use on political or moral grounds, but, as in *Sindel,* Congress has enacted a statute requiring all residents to provide the information. Since it is only information being sought, and plaintiffs are not being asked "to disseminate publicly a message with which [they] disagree[ ]," the First Amendment protection against compelled speech does not prevent the government from requiring the plaintiffs to answer these questions. *Sindel,* 53 F.3d at 878.[7]

6. The government cites *Glickman v. Wileman Bros. & Elliott,* 521 U.S. 457, 470–71, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997). In *Glickman,* growers, handlers, and processors of California tree fruits challenged the validity of regulations contained in marketing orders promulgated by the Secretary of Agriculture. These orders imposed on the growers assessments that covered the expenses of administering the orders, including the cost of generic advertising of California fruits. Glickman did not wish to finance this generic advertising and maintained that the governmentally imposed requirement abridged his freedom of speech. *Id.* The Supreme Court found that requiring Glickman to pay his share of the generic advertising did not abridge his right of free speech, but the case is not helpful here. Glickman was a so-called commercial speech case, and as such is viewed under different standards than a non-commercial speech situation, such as the instant case. *See id.*

7. The fact that the plaintiffs have demonstrated that in time of war census data was improperly used against persons of Japanese ancestry does not establish that it is likely that

## IV. Fourth Amendment

Finally, plaintiff Van Fleet [8] argues that the long form questionnaire, as presently constituted, violates his rights under the Fourth Amendment. He argues that the numerous and intrusive questions that he is required to answer on the long form constitute an unreasonable and illegal search under the Fourth Amendment. Van Fleet argues that the Fourth Amendment, as interpreted in modern cases, protects privacy. He cites *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *United States v. Janik*, 723 F.2d 537, 547–48 (7th Cir.1983). The greater the privacy interest of the individual, the greater must be the government's justification for invading that privacy. *Skinner v. Railway Labor Executives Ass'n.*, 489 U.S. 602, 633, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Taylor v. O'Grady*, 888 F.2d 1189, 1199 (7th Cir.1989); *Willner v. Thornburgh*, 928 F.2d 1185, 1187–88 (D.C.Cir.1991) (holding that "decreasing levels of intrusiveness require the least decreasing levels of justification").

Van Fleet argues that the questions posed to him on the long form constitute a gross invasion of his privacy. He is required to disclose information about his medical history and condition, his ancestry and ethnic background, his income, his work habits, including how long it takes him to drive to work, and detailed information about his home, including the number of bedrooms, the nature of his plumbing, whether he owns or rents, even whether he pays his rent in cash. For all these matters, Van Fleet argues that he has a reasonable expectation of privacy, and cites *Yin v. State of California*, 95 F.3d 864, 868 (9th Cir.1996).

Van Fleet focuses on the questions concerning his medical condition, namely, question sixteen which asks about definite conditions and question seventeen which asks if he has difficulty because of his medical condition in doing a list of activities. He points out that "many if not all of these questions are matters a person would normally discuss only with his doctor or family member." A person has a reasonable expectation of privacy with respect to information regarding his medical condition. *Cf. id.* at 870; *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that society is concerned for the security of one's person).

Van Fleet argues that to compel him to answer questions about his medical condition under threat of criminal sanctions compels him to submit to a medical examination against his will and that such a medical examination clearly is a search that implicates the Fourth Amendment.[9] *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (finding that high school drug testing is not an unreasonable search and seizure). In order to invade such privacy in a noncriminal context, the government must show "special needs" for the information, beyond the normal need for law enforcement. Despite the many justifications cited by the government in Exhibit 1 to its brief, Van Fleet maintains that defendants have not demonstrated a special need. Van Fleet points out that he is not engaging in a dangerous activity that would require information concerning his medical condition as in *Dimeo v. Griffin*, 943 F.2d 679, 684 (7th Cir.1991), nor is he seeking a sensitive informational position that would justify mandatory drug testing as in *National Treasury Employees Union v.*

the Census Bureau would improperly promulgate and attribute to plaintiffs their answers to the Census 2000 questions.

8. Van Fleet is the only one of the plaintiffs to receive the long form questionnaire.

9. To argue beyond search and seizure, the plaintiffs would need to resort to the privacy rights theories of *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Roe v. Wade* 410 U.S. 113, 93 S.Ct. 705, .35 L.Ed.2d 147 (1973), to find Fourth Amendment protection from coerced revelations on a census form of one's medical, mental, birth, and financial status. The plaintiffs have not made those arguments.

*Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Rather, Van Fleet argues, he has been singled out at random with no justification for intrusive questions concerning his medical condition, and has been told only that such information might be used by agencies and legislators. Van Fleet maintains that this is not enough to justify the unwarranted and unwelcome invasion of his privacy. In *Taylor v. O'Grady,* 888 F.2d 1189 (7th Cir.1989), the Seventh Circuit held that a "generalized" governmental interest was not sufficient to overcome a Fourth Amendment challenge in the context of medical testing and examination. *Id.* at 1199.

■ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." In *Wyoming v. Houghton,* 526 U.S. 295, 299, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), the Supreme Court held that to determine whether a particular governmental action violates the Fourth Amendment, a court must first inquire whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed. *Cf. Wilson v. Arkansas,* 514 U.S. 927, 931, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); *California v. Hodari D.* 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). If that inquiry fails to answer the question, *Wyoming v. Houghton* held that the next step is to evaluate the search or seizure at issue "under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." ͵ *Id.* at 299, 119 ͵S.Ct. 1297. *Cf., e.g., Vernonia Sch. Dist.,* 515 U.S. at 652–653, 115 S.Ct. 2386.

■ The Census Bureau points out that from the very first census, performed in 1790, Congress authorized questions pertaining to age, gender, and race.[10] It also points out that the Supreme Court defers to the statutes of the First Congress because so many Framers of the Constitution were members of that congress. The fact that the First Congress included questions in addition to the head count is strong support for the constitutionality of additional questions as a general proposition. Thus, using the first step in the Supreme Court's *Wyoming v. Houghton* analysis, it is clear that asking personal questions of residents of the United States in the census was not regarded as an unlawful search. Of course, the Census 2000 goes beyond mere questions of sex, race, and age. Questions about the medical conditions of the members of Van Fleet's household would, in other contexts, be considered private, but Census 2000 is the not the first census to ask such questions. Inquiries on disability and health have been asked on the census since the fifth census in 1830. For example, that census asked if members of the household were "deaf," "dumb," or "blind." 4 Stat. 383 (1830). The sixth census for 1840 collected data on "idiots" and the "insane." 5 Stat. 331 (1839). Of course the mere fact that these inquiries were not challenged at the time does not prove that they were not unreasonable searches in violation of the Fourth Amendment, but it does give an historical perspective of the attitude of the Congress forty plus years after the framing of the Constitution. In 1850 the census asked additional information, including occupation or trade, place of birth, school attendance, literacy, and criminal records. Asking questions well beyond the constitutionally mandated headcount is far from a novel idea of twentieth century big government bureaucrats.

The plaintiffs rely heavily upon the statement in Justice Scalia's concurrence in *Department of Commerce v. U.S. House*

---

**10.** The first census asked if a household had white males or females, whether the white males were 16 years old or older, and whether "other free persons" lived in the household. 1 Stat. 99, 101 (1790). Defendants' Motion to Dismiss, Or Alternatively, For Summary Judgment, [hereinafter Defendants' Brief] at 11–12.

*of Representatives,* 525 U.S. 316, 345, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999), which stated, "The authorization of sampling techniques in the 'decennial census of population' is not necessarily an authorization of such techniques in all aspects of the decennial census—any more than it is necessarily an authorization of all sampling techniques (for example, those that would violate the Fourth Amendment)." Justice Scalia's dicta raises the notion that some undefined sampling techniques that might be used in the census could infringe the fourth amendment rights of a resident of the United States. Justice Scalia is not holding that Census 2000's sampling techniques have done so.

Since the first step of the *Wyoming v. Houghton* analysis takes us only so far, the next step must be utilized. In other words, to what degree is Van Fleet's privacy intruded upon, and to what degree is the information needed for the promotion of legitimate governmental interests? The Census Bureau cites a number of reasons why the questions on disability (16 and 17) are asked. For example, it states that the questions are "[u]sed to distribute funds and develop programs for people with disabilities and the elderly under the Rehabilitation Act ... [and that they are] [n]eeded under the Americans with Disabilities Act to ensure that comparable public transportation services are available for all segments of the population, etc." Exhibit I to Defendants' Brief, "Uses for Questions on Census 2000" at 58. The Bureau lists on the next page a number of agencies that need such statistics to fulfill their statutory functions. The Census Bureau has asked these private questions to obtain demographic date to be used for articulated reason.

Although Van Fleet is required to answer these very private questions, the Census Bureau assures him and the court that the law forbids the Bureau from attributing Van Fleet's answers to Van Fleet. Rather, the Bureau is collecting this data merely for demographic purposes to inform the governing body of statistical facts so that they may better govern. The

law requires that the census data on individuals is to be maintained in strict confidence. The census returns may only be viewed by sworn employees of the Bureau and the Department. 13 U.S.C. § 9(a)(3). Copying of individual returns is proscribed. *Id.* § 9(a). Census returns cannot be subpoenaed and may not be used as evidence in any proceeding without the consent of the individual. Section 9(a)(2) provides that the compilation cannot be released with information "whereby the data furnished by any particular establishment or individual can be identified...." *Id.* § 9(a)(2). The United States argues that the census is not in any real sense a "search and seizure" because it does not involve physical intrusion into the home, touching of the body, or seizure of property. The census consists merely of a mailing to the home of a series of questions, to which the government requires answers. The government cites *United States v. Rickenbacker,* 309 F.2d 462, 463 (2nd Cir. 1962), which found the census to be reasonably related to government purposes and functions. Rickenbacker was convicted of refusing to answer a schedule entitled "Household Questionnaire for the 1960 Census of Population and Housing," in violation of 13 U.S.C. § 221(a). This questionnaire was sent to every fourth household in the United States. Rickenbacker told the census enumerator that he did not intend to answer the questionnaire, and he told the Grand Jury that indicted him that the questionnaire represented "an unnecessary invasion of my privacy" and that he desired to "maintain liberties in this country as a constitutional philosophical question." *Id.* He also told the grand jury that he did not base his failure to respond upon any fear of self-incrimination. *Id.* The Second Circuit found that "The authority to gather reliable statistical data reasonably related to governmental purposes and functions is a necessity if modern government is to legislate intelligently and effectively." *Id.* (citing *United States v. Moriarity,* 106 F. 886, 891–892

(S.D.N.Y.1901)).[11] The *Rickenbacker* case was cited with approval in *Wyman v. James,* 400 U.S. 309, 321, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), which held that a welfare caseworker's home visit was no more an unreasonable intrusion within the Fourth Amendment's ban than the "census taker's questions."

In reviewing a challenge to the government's collection of racial and ethnic information in the employment context, the Second Circuit in *Caulfield v. Bd. of Educ. of the City of New York,* 583 F.2d 605 (2nd Cir.1978), held that "there is no search or seizure" in the context of such a census and labeled the Fourth Amendment challenge as "frivolous" *Id.* at 612. The government reasons that the court was able to dismiss this claim easily because there was neither an entrance into the home nor interference with property interests, nor a seizure as contemplated by the Fourth Amendment. *Cf. United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (stating that "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property").

The government points out that the cases cited by Van Fleet involved uninvited entry by the government agents into a home, *see, e.g., Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *United States v. Janik,* 723 F.2d 537 (7th Cir.1983), touching of or intrusion into the body, *see, e.g., Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132

L.Ed.2d 564 (1995), and a government presence in an area where a reasonable expectation of privacy exists, *see, e.g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). By contrast, Van Fleet received a form in the mail which requires him to answer questions about himself and his household. .

Applying the *Wyoming v. Houghton* analysis, it is clear that the degree to which these questions intrude upon an individual's privacy is limited, given the methods used to collect the census data and the statutory assurance that the answers and attribution to an individual will remain confidential. The degree to which the information is needed for the promotion of legitimate governmental interests has been found to be significant. A census of the type of Census 2000 has been taken every ten years since the first census in 1790. Such a census has been thought to be necessary for over two hundred years. There is no basis for holding that it is not necessary in the year 2000.

### VI. Conclusion

The Court finds that there is no basis for holding Census 2000 unconstitutional. Accordingly, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment With Supporting Authorities (Instrument No. 12) is hereby **DENIED.** It is further

**ORDERED** that Defendants' Motion to Dismiss, Or Alternatively, For Summary Judgment (Instrument No. 13) is hereby **GRANTED.**

### SUMMARY JUDGMENT

In accordance with the Court's Memorandum and Order of this date, it is hereby

11. Moriarity was charged with making a fictitious census return. He was a special agent appointed under the Census Act of 1899 and sworn to assist in taking the twelfth census. He argued, among other things, that the act was unconstitutional because it provided for more than an enumeration and violated the Fifth Amendment. The court held "It would be curious governmental debility that should incapacitate the nation from directing its census enumerator to ask an inhabitant concerning his business because for certain purposes he was only to be counted, and perhaps his gender ascertained. The functions vested in the national government authorize the obtainment of the information demanded . . . ." *United States v. Moriarity,* 106 F. 886, 891 (S.D.N.Y.1901).

ORDERED, ADJUDGED, and DE-CREED that the Plaintiffs' Motion for Summary Judgment is **DENIED**; it is further

ORDERED, ADJUDGED, and DE-CREED that the Defendants' Motion for Summary Judgment is **GRANTED**; it is further

ORDERED, ADJUDGED, and DE-CREED that Plaintiffs' case is **DIS-MISSED** with prejudice, with costs of court to be payed by Plaintiffs.

This is a **FINAL JUDGMENT.**